No. 4125

Second Circuit

PETER ANTOINE v. INTERURBAN TRANSPORTATION CO., INC.

(March 16, 1932. Opinion and Decree.)

Guion & Upton, of New Orleans, and Peterman, Dear & Peterman, of Alexandria, attorneys for plaintiff, appellant.

Hawthorn, Stafford & Pitts, of Alexandria, attorneys for defendant, appellee.

McGREGOR, J. Plaintiff instituted this suit for damages for personal injuries received in a collision between a Ford roads-

ter in which he was riding and a passenger bus owned and operated by the defendant. On Sunday, February 17, 1929, the plaintiff, in company with his two brothers, Milton and Clarence Antoine, was riding in a Ford roadster driven by his brother, Milton Antoine, on the Jefferson highway, returning from a visit in Alexandria to his home in Cottonport, in Avoyelles parish. While proceeding thus on their way home about an hour or more after dark, at a point between the towns of Meeker and Cheneyville, less than one hundred feet south of where another road leading in a southwesterly direction to Meridian and Eunice intersects the Jefferson highway, the automobile in which the three brothers were riding collided with one of the busses of the defendant. The result of this collision was that the Ford roadster was turned over on its side on the west edge of the road near the side ditch, and was practically demolished. The plaintiff was thrown completely out of the car over into the ditch and his two brothers were pinned beneath it and had to be extricated therefrom. The Ford roadster was subsequently rolled into the ditch in order to clear the road for traffic. As soon as the bus could be straightened and made to run the three injured brothers were placed in it and carried back to Alexandria. Before leaving the scene of the collision the driver of the bus and some of his passengers found quite a large number of glass whiskey containers in and around the wrecked automobile. This caused the driver of the bus to conclude and think that the three brothers had been drinking and that that was the cause of the collision. These containers ranged in size from a five-gallon demijohn to several pint bottles, and they were also loaded into the bus and when he reached the town of LeCompte, the driver telephoned to the office of the defendant at Alexandria and told of the accident as well as the finding of the whiskey bottles. When they reached Alexandria they were met by three policemen who, seeing the condition of the injured men, took them to the Baptist hospital, where they were given the necessary treatment. Milton Antoine died in the course of a few hours and Peter Antoine, the plaintiff herein, was kept at the hospital about thirty-six hours and dismissed. Clarence Antoine, who was more seriously injured, was placed in a cast and after the lapse of about two weeks' time he was sent home with instructions to wear it three months or longer, according to his home conditions.

On January 9, 1930, the plaintiff filed this suit for $5,000 damages for the injuries alleged to have been received by him in the collision. In his petition he alleges that as he and his two brothers were proceeding south on the right side of the Jefferson highway, at a moderate rate of speed, they met the bus of the defendant, and that instead of keeping to his right side of the road, the driver of the bus suddenly turned toward the left in an attempt, apparently, to pass another automobile, and that in doing this he struck the Ford roadster in which the plaintiff and his two brothers were traveling, and overturned it into the ditch and demolished it. It is specially alleged that the driver of the roadster was free from all negligence and that the collision was due solely to the carelessness and gross negligence of defendant's driver.

In answer to the plaintiff's petition the defendant denied all allegations of negligence and specially alleged that just before the collision the driver of the Ford car suddenly swerved from its right side of the road over to the left side, which

was the right side for the bus, and that as the automobile thus bore down upon the bus over on the bus' right side, the driver of the bus realized that he was confronted with an inevitable collision. It is then alleged that in the emergency thus created by the driver of the automobile in suddenly swerving to the wrong side of the road, the driver of the bus, in an effort to avoid the collision, cut or steered it toward the left side, but that in spite of this movement on his part the collision occurred. It is further alleged that the occupants of the automobile were intoxicated at the time and that the collision was due solely to the negligence of the driver of the automobile and that the driver of the bus was guilty of no negligence whatever. In the alternative the defendant pleaded contributory negligence on the part of the plaintiff and the occupants of the automobile.

Upon trial in the lower court there was judgment in favor of the defendant, rejecting the plaintiff's demand and dismissing his suit. From that judgment the plaintiff has appealed.

## OPINION

Counsel for appellant very correctly state that the only question involved in this case is one of fact, subject, of course, to the construction that we place upon the testimony of the witnesses. They state in effect that the sole question of fact is: Did the driver of the automobile leave his side of the road and drive in front of the defendant's bus, or did the driver of the bus leave his side of the road in a reckless attempt to pass an automobile ahead of it and knock the automobile in the ditch? As is often the case in automobile collision cases, the evidence of the plaintiff and defendant is diametrically opposed and almost impossible to be reconciled.

Immediately after the collision, when the automobile and the bus had come to a state of rest, the automobile was on its side on the edge of the west side of the road. The bus had struck it on or about the left front door at about the point where the driver was sitting. The front of the bus was entangled with the automobile, and its left front fender, spring, bumper and light were all broken and the bus was in a position across the road at an angle of about 45 degrees, with its rear end at about the center of the road. It is the contention of the plaintiff that the automobile was at all times completely on the west or its right-hand side of the road, and that the bus ran over to that side and struck it. On the other hand, the defendant asserts that the automobile suddenly left its side of the road and ran over to the east or left side and apparently was headed directly toward the bus, with a head-on collision inevitable, and that in order to avert this collision the bus driver did the only thing that a prudent man would do and turned suddenly to the west or his left, but that just as he was thus turning, the automobile turned again quickly to its right and ran in front of the bus and was struck.

In support of the plaintiff's theory there were a number of witnesses sworn. Peter Antoine, the plaintiff and one of the occupants of the wrecked automobile, gives his version of the accident as follows:

"On our way home from Alexandria we were driving along, we wasn't going fast and some cars were proceeding towards Alexandria here and the bus was behind some cars coming towards Alexandria and the bus pulled off on the side of the road to pass those cars there where the collision come in, struck the door on our car, turned it over in the side of the ditch."

Clarence Antoine, another occupant of

the wrecked automobile and the plaintiff in another suit, gave about the same version in the following words:

"I remember seeing three cars ahead of the bus as far as I can remember, and the bus came around from the last car and collided into us, knocked the automobile in the ditch, and my brother, Peter, was unconscious. He fell in the ditch and as I formerly stated, I was under the car and my brother Milton under the car.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Now, were these three cars bunched very close together?

"A. As far as I can remember; yes, sir.

"Q. Then the bus was right behind the last one?

"A. Well, I first saw the bright lights of the bus. It was coming out from behind the third car.

"Q. Was that about the time you saw the other cars?

"A. Well, I saw the other cars' lights first, and after they passed I saw a bright light run out and it crashed into us.

"Q. Had you got as far as the Meridian road when the bus turned out?

"A. We had got about 75 or 80 feet past that road.

"Q. Before the bus turned out?

"A. Yes, sir.

"Q. That is the first time you saw the bus, when it turned out?

"A. Yes, sir.

"Q. How far would you say you were from the bus then, when the bus turned out?

"A. I couldn't estimate it, it was did so quick.

"Q. How far was the collision from the Meridian road?

"A. About 75 or 80 feet.

"Q. About that far when you first saw the bus?

"A. Well, we was.

"Q. You were where with reference to the Meridian road when you first saw the bus? Had you got to the Meridian road?

"A. Yes, sir.

"Q. Then you say you were 75 to 80 feet beyond the Meridian road when the bus turned out?

"A. Struck us about 70 feet below the Meridian road.

"Q. Then the first you saw of the bus was at the Meridian road?

"A. Yes, sir; somewhere along there.

"Q. And the bus was coming out from behind these cars?

"A. Yes, sir."

It will be observed that it is the testimony of these two occupants of the wrecked automobile that there were three automobiles in front of the defendant's bus, all traveling in the same direction—that is, towards Alexandria—and that it was while the bus driver was undertaking to overtake and pass the car nearest to him the collision occurred. To corroborate this statement of these two witnesses on this point, there was produced and sworn a witness named Ned King. He testified that on the evening of the collision he was a short distance ahead of the bus, also traveling towards Alexandria, and that there were two other automobiles traveling in the same direction between him and the bus. It must be remembered in any discussion of the testimony that it is a proved fact that the scene of the accident was between 75 and 100 feet south of where the Meridian road branched off from the Jefferson highway in a southwesterly direction. Ned King says that he was traveling at a rate of speed not to exceed about twenty miles per hour; that he passed the Antoine car south of where the Meridian road branches off; that he heard the collision and stopped almost instantly, and that at that moment he was about three hundred yards ahead of the bus which, of course, had stopped at a point between 75 and 100 feet south of the Meridian road. He testified further that just as he stopped two other cars passed him, going towards Alexandria. He says he got out of his car to see what the trouble was and started back toward the wreck, but that because of the fact that

he was in a hurry he went only ten feet, waited about ten minutes and then got in his car and went on to Alexandria without making any further investigation of the matter. The time of the accident was about an hour or more after dark and the witness never got closer than three hundred yards to the scene, yet he undertakes to tell of the people there. His testimony is so inconsistent and unreasonable it is unworthy of any consideration.

It is sought to corroborate the plaintiff's theory by the physical situation existing at the moment when both cars had come to a standstill. It is clear from all the testimony of both plaintiff and defendant that the two vehicles were interlocked on the edge of the road. In other words, the bus did not knock the Ford car clear of the road. Furthermore, all the evidence and also the photograph of the wrecked automobile indicate that the bus struck practically a broadside blow and not a glancing one. If the car in which the plaintiff was riding had been traveling straight down the highway on the right-hand side as is contended by the plaintiff, and if the bus had turned toward its left in order to pass another car ahead of it going in the same direction, the blow would have been a glancing one, the entire left side of the car would have been stripped and more than likely it would have been hurled completely off the road. Take it on the other hand: If the Ford car suddenly crossed the road toward the defendant's right and then quickly turned again toward its right after the bus had also turned toward its left side in order to avoid a collision on the east or defendant's right side the position of the two cars at the moment of the collision would have been approximately perpendicular and the blow would be broadside and not glancing, and, as a matter of fact, it would be much harder to knock the car off the road.

The testimony of W. M. Dunn, the driver of the bus, is to the effect that just before the collision there were no cars in front of him on his side of the road going toward Alexandria, but that three cars were coming toward him from the north; that two of them turned out to the west down the Meridian road and that the other one, in which the plaintiff was riding, continued on south on the Jefferson highway, meeting him; that as the Antoine car got even with the Meridian road, the driver seemed to have lost control of it and it dashed toward the left or east and a collision on that side of the road seemed imminent, and that as a consequence he, the bus driver, in order to avoid a collision, turned his bus to his left and that as soon as he did this the automobile also turned in the same direction. On this point he testified as follows:

"Q. Just before the collision took place did you have a clear view of the highway in front or was there any other cars traveling in the same direction you were, in front of you?
"A. There was not any cars traveling in front of the bus for half a mile.
"Q. Why do you say that?
"A. Because there is a turn in the road a half a mile.
"Q. Were there any cars traveling in sight going the same direction you were?
"A. No, sir.
"Q. Was the road where the accident took place—was it straight or was it curved?
"A. Straight.
"Q. About how far below the intersection is the road straight?
"A. It's one mile at least.
"Q. In other words, you had come along a straight highway for a mile before the collision took place?
"A. Yes, sir.
"Q. During that period of time did you observe anywhere along that straight

stretch of road in front of you any cars going in the same direction?

"A. No, sir; there was not.

"Q. Just before you arrived at this intersection did you see an automobile coming towards you?

"A. Yes, sir; there was three.

"Q. Three?

"A. Yes, sir.

"Q. Going which way?

"A. Going towards Bunkie.

"Q. Did any of them turn off the road going towards Meridian?

"A. Two.

·"Q. And what direction did the other take?

"A. He cut clean across the road after crossing the intersection of the Meridian road and on to my extreme right-hand side and whipped back and tried to get back on his side of the road.

"Q. At what point did he seem to leave his right-hand side of the road?

"A. Just as he got to the center of the Meridian road.

"Q. Did he apparently come straight on his left side of the road? Just describe it.

"A. The way it appeared to me on this road there where this Meridian road turns off is a big pile of loose gravel where the cars had been turning during the day and piled this gravel up at least a foot and a half, and it seemed that when he hit this loose gravel he lost control and whipped over in the ditch on his left and then whipped back to the right, too late to avoid the collision.

"Q. Now, when you saw the oncoming car in that position, what did you do?

"A. I tried the best I could to stop the bus.

"Q. About what rate of speed were you going?

"A. Between 30 and 40 miles an hour.

"Q. Was that the usual, customary speed?

"A. That is the usual speed. You have to run between 30 and 40 miles an hour to make schedule.

"Q. At what rate of speed was the oncoming car that collided with the bus traveling, as far as you could tell?

"A. He was going as fast as the Ford car would run. I can't say how fast it would go, but as fast as it could run.

"Q. At what point on the highway did the collision take place, on the right-hand side?

"A. Taken place on my extreme right-hand side.

"Q. When the collision took place about how far did you go before you could or did stop the bus?

"A. 25 or 30 feet.

"Q. Well, what direction did you go in attempting to stop the bus and why did you go in that particular direction?

"A. I went in a left direction for the reason that the left front spring broke, left front fender locking front wheels to the extreme left. Could not steer the bus at all after the collision occurred."

W. H. Foret, an automobile salesman living in Eunice, was an eye-witness to the collision. He was driving one of the three cars that Dunn, the bus driver, said were meeting him just before the collision. He had been in Alexandria and was on his way to his home in Eunice. He trailed the Antoine car for some little distance and as he reached the Meridian road he turned down the same and saw the Antoine car proceed down the Jefferson highway. When he had traveled about twenty yards he heard the crash of the collision and saw the wreck. He stopped his car and ran to give what assistance he could. His testimony corroborates that of the bus driver in every particular, and in part is as follows:

"Q. Describe what happened and what you saw from the time when you first saw the Ford roadster in front of you.

"A. When I first saw the Ford I followed the roadster and when I turned off the roadster kept on straight south. It was then I heard the noise and stopped my car and saw there was a collision. I stopped my car and ran out there, I didn't know who it was.

"Q. You had turned off a short distance into the Meridian road when the accident took place?

"A. Yes, but I was very close.

"Q. Did you actually see the collision?

"A. Yes. I tell you it occurred to me the bus had run over the car and crashed it down, when it hooked on the roadster and when I got there there were two negroes in the ditch and one under the steering wheel on the side of the road.

"Q. You state you actually saw this collision from your automobile? I would like to have you state exactly the position of the bus on the highway at the time of the collision with reference to the left or right side of the road, at the time it actually struck?

"A. At the time it collided the bus was on the right-hand side of the road going north.

"Q. I believe you stated the bus was on its own right-hand side of the road when the collision actually took place?

"A. Yes.

"Q. Then what happened when the collision occurred?

"A. When the collision occurred the bus, after it stopped, it was sort of angle in the road from the time it hooked the roadster on the right-hand side, it seemed it hooked the roadster and it pulled it across the road, and the roadster was turned over on the left-hand side of the road with the bus hooked on to it.

"Q. You say the Ford came to a stop on the left-hand side of the road, do you mean facing north or south?

"A. Facing north. What caused the roadster to be there at the time is because it pulled the bus from the right-hand side to the left.

"Q. About how far would you say the bus traveled between the moment of the impact and the time it came to a complete stop?

"A. I might say about, I suppose twenty feet, something like that."

Foret corroborates defendant's driver in his testimony that the collision took place on the bus' right side of the road and that the force of the impact carried the Ford car across the road with the bus hooked into it. He also corroborates the driver in his statement that there were no other cars going north in front of him as follows:

"Q. As you were driving down and before you reached the Meridian road, or at the time you reached the Meridian road and were about turning off the Jefferson highway, did you notice whether there were any other automobiles going toward Alexandria and driving ahead of the bus?

"A. No, sir; I noticed there was nothing in front of the bus. There were cars coming behind a good piece off, but there was none ahead of the bus."

The testimony of several of the passengers on the bus was taken by the defendant. Mrs. Mary M. Johnson, district supervisor in the extension department of the Louisiana State University, the only lady passenger on the bus, testified positively that the bus was on its right side and that the Antoine car was over on the same side. She says she looked up and saw the lights immediately in front and wondered what would happen. In describing the situation as she remembered seeing it, she said:

"I remember distinctly knowing that it was dark and looking up and seeing the car in front of the bus and knowing there was going to be a collision; the car came right into the bus. The bus was on its right side of the road and traveling at a moderate rate of speed. I know this—it flashed through my mind—I was the only one in the front seat—I noticed the fact that this car came right on our side of the road with the lights blazing. I don't think the car was over ten feet from us."

F. W. Bennett, a passenger, formerly with the Department of Conservation of this state, but at the time of giving his testimony a student at New Haven, Connecticut, gave his testimony by commission in part as follows:

"Q. On what side of the road, with reference to the bus, was the bus traveling?

"A. On right hand side of road. ,

\* \* \* \* \* \* \*

"Q. What, if anything, did you see of a car traveling in the opposite direction of the bus?

"A. I saw the lights of the approaching car just before the collision.

"Q. If you answer that, just before the collision, you saw a car coming towards the bus, please describe fully its actions just before the accident occurred?

, "A. While bus was traveling on right side of road at 40 miles per hour I saw a car approaching the bus coming in opposite direction on its right side and when said Ford car arrived at a point a short distance (about 50 feet) of the bus, said car turned sharply to its left, in front of said bus. The driver of the bus immediately applied the brakes but could not stop to avoid the collision and consequently said bus collided with the Ford, hitting it broadside.

"Q. Please describe fully just what the bus driver did just before the collision took place.

"A. The bus driver applied both the foot brake and emergency brake shortly before collision took place.

"Q. Please describe as accurately as you can, just how long, and in what space, it took the bus driver to bring the bus to a complete stop.

"A. It took said bus driver several seconds to bring the bus to a complete stop and not until after it collided with said car—the space being about 50 feet.

\* \* \* \* \* \* \*

"Q. Did these two vehicles collide head-on? If you say yes, then state on which side of the road the collision took place.

"A. No. The Ford car had turned sharply to its left and in front of the bus when the collision occurred."

Charles E. Naylor, another passenger, of St. Louis, Missouri, also testified by commission. Several points of his testimony are very inaccurate. For instance, he states that he was the only white man passenger on the bus when as a matter of fact there were several. He says there were positively nine negroes on the bus, when there was only one. However, his testimony as to how the collision occurred bears all the ear-marks of truth. It must be remembered that the time of the accident was about an hour after dark and it is difficult to tell from memory the exact movements of an oncoming automobile. The following excerpts from his testimony corroborate the driver of the bus to a large extent:

"Q. On what side of the road, with reference to the bus, was the bus traveling?

"A. The bus was traveling on the right-hand side of the road. It was a gravel road, going through a part of the Louisiana swamp, about eight o'clock in the evening, and it was raining.

\* \* \* . \* \* \* \*

"Q. What, if anything, did you see of a car traveling in the opposite direction of the bus?

"A. I saw a car which was the car involved in this collision, traveling in the opposite direction of the bus, turning out from the line of traffic and cutting around cars in front of it. It cut in ahead of possibly four or five cars just before the accident. Just before the accident it cut out from behind a car directly into the path of the bus, headed for an intersecting road on the right side of the highway as we were traveling in the bus. After it had reached the far side of the highway, the Ford then again turned toward the left side of the highway, and crashed into the left side of the bus, damaging the front left fender, breaking the light off, and throwing the car out of line.

"Q. If you answer that just before the collision you saw a car coming towards the bus, please describe fully its actions just before the accident occurred.

"A. As stated in answer to the preceding question, I saw the car which was involved in the accident turning out from the line of traffic, cutting around cars, pulling out the last time to the right side of the highway directly in front of the bus, then reversing its direction in an attempt to return to the left side of the

highway and colliding into the bus. The last time it turned out when the accident occurred, it all happened in just a few seconds.

"Q. Please describe fully just what the bus driver did just before the collision took place.

"A. After the car in which the negroes were riding turned to the far right side of the road, the driver of the bus swerved to the left, bringing his bus to the middle of the road. Then when the negroes reversed their direction, he applied the brakes, both the foot and hand brakes, and did all possible to bring the bus to a stop to avoid the collision. The bus after the collision, was stopped practically in the middle of the road.

\* \* \* \* \* \* \*

"Q. What part of the bus, if you recall, hit the Ford car, and where was the Ford car struck?

"A. The left front light and fender of the bus hit into the left side of the Ford car at about the engine and steering wheel, demolishing the car. It was a severe impact as the Ford was traveling at approximately forty-five miles an hour at the time of the crash."

Arthur E. Young, a passenger, of Wood Haven, Long Island, New York, testified in part as follows:

"Q. If you answer that just before the collision you saw a car coming towards the bus, please describe fully its actions just before the accident occurred.

"A. Everything was apparently in order until the car approached within probably one hundred yards of the bus. The oncoming car swerved from one side of the road to the other.

"Q. Please describe fully just what the bus driver did just before the collision took place.

"A. The bus driver slowed his car and made a couple of efforts to miss the oncoming car and called back to the passengers to hold on to their seats.

"Q. Please describe as accurately as you can, just how long, and in what space, it took the bus driver to bring the bus to a complete stop?

"A. The driver had brought the bus practically to a stop when struck by the Ford.

\* \* \* \* \* \* \*

"Q. What part of the bus, if you recall, hit the Ford car, and where was the Ford car struck?

"A. The left front wheel, fender and bumper of the bus were struck by the forward part of the Ford car."

J. H. Eteen, another passenger, of St. Louis, Missouri, strongly corroborates the bus driver. His testimony on the point of the relative positions of the bus and automobile before and after the collision is as follows:

"Q. What, if anything, did you see of a car traveling in the opposite direction of the bus?

"A. I saw headlights from the left flash across the road to the right of the bus, then suddenly swerve right back in front of the bus just in time to receive the full impact of the bus.

\* \* \* \* \* \* \*

"Q. Please describe fully just what the bus driver did just before the collision took place.

"A. The bus driver did not have much chance to do anything but set his brakes. Distance was too short for them to have any effect.

"Q. Please describe as accurately as you can, just how long, and in what space, it took the bus driver to bring the bus to a complete stop.

"A. Within twenty feet. Stopped almost instantaneously on account of the impact.

\* \* \* \* \* \* \*

"Q. If you say that before the collision you saw the Ford car approaching the bus, how far was it from the bus when you first saw it?

"A. First time I saw the lights they were to the left, then dashed across to the right and then dashed right back in front of the bus.

"Q. Did these two vehicles collide head-

on? If you say yes, then state on which side of the road the collision took place.

"A. Did not collide head-on. Front of the bus hit the Ford car amidships. As best I can remember slightly towards the left-hand side of the road with reference to bus driver."

In cases of this kind it is always with a great deal of reluctance that we ever find the facts contrary to the view of the trial judge, who has so much better opportunity to see and judge the witnesses, as well as the testimony given by them. In this case the judge of the lower court has found the facts to be in favor of the defendant and has rejected the plaintiff's demand. After having read and fully considered all the testimony, we are fully convinced that, not only has the plaintiff failed to make out a case, but the defendant has shown by a preponderance of testimony that the bus driver was free of all charges of negligence and that the collision was due entirely to the fault and negligence of the driver of the Ford roadster. The testimony fully convinces us that there were no cars ahead of the bus which it was trying to pass. And if there were none, there was no possible excuse for the bus to have turned to its left as is claimed by the plaintiff. The testimony of the passengers is unanimous that it never turned to the left except in an effort to avoid the collision—the danger of which arose from the fact that the Antoine car suddenly left its side of the road and went over to the side where the bus was and had a right to be. In this sudden emergency the driver was justified in resorting to whatever his best judgment dictated under the circumstances.

Counsel for plaintiff criticizes the defendant very severely for not having secured the testimony of more of the passengers than it did. We do not think the criticism is just or deserved. The witnesses who gave their testimony appear to have been people of the highest type. It is remarkable that this many responded to the request to give their versions of this affair. It is urged that no probative force can be given to the testimony of these strangers because they were inside a lighted bus. They certainly could tell what side of the road the bus was on. They could easily see whether an oncoming car was headed for the bus, was crossing the road, or was on its own right side. They could certainly see whether the bus was passing another car at the time of the accident. The testimony of Dunn, the driver of the bus, was straightforward and honest and we find that he was corroborated in every particular. Only one person was found to corroborate the two Antoine brothers as to there having been three cars in front of the bus, and that was Ned King, who claims to have been the foremost of the three. His testimony is so unreasonable and improbable that it cannot be believed.

We have not considered the question of intoxication of the driver of the automobile, but we will say in passing that we do not attach any importance to this phase of the case. We do not think that any of the three brothers were drinking. But it is passing strange that neither of the survivors admitted knowing anything of the presence of the whiskey bottles and demijohns. Their denial of any knowledge whatever of these bottles is enough to destroy all confidence or belief in the rest of their testimony, particularly since it has all been so successfully contraverted by testimony of witnesses whose veracity has not been impeached.

For the reasons assigned, the judgment appealed from is affirmed; the plaintiff and appellant to pay all the costs of both courts.